FILED
06/09/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 12, 2021 Session

## IN RE ANNA H., ET AL

**Appeal from the Chancery Court for Anderson County**
**No. 17CH9327    M. Nichole Cantrell, Chancellor**

_____

**No. E2020-01206-COA-R3-PT**

_____

This case involves a petition to terminate parental rights. The petition was filed by the children's biological father and stepmother against the biological mother. The trial court terminated the mother's rights, finding that the mother abandoned the children under Tennessee Code Annotated section 36-1-113(g)(1) and -102(1)(A)(iv) and that termination was in the best interest of the children. We affirm the trial court's decision and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

L. Rosillo Mulligan, Harriman, Tennessee, for the appellant, Meagan H.[1]

Henry Daniel Forrester, Clinton, Tennessee, for the appellees, Jessica H., and Wayne H.

## OPINION

### I.    FACTS AND PROCEDURAL HISTORY

Meagan H. ("Mother") and Wayne H. ("Father") are the biological parents of Anna H. and Mason H. (collectively "the children"). Anna was born in January 2006, and Mason was born in July 2012. The children were born during Mother and Father's marriage, but the parties divorced in June 2014. Father remarried to Jessica H. ("Stepmother")

---

[1] In actions involving a juvenile, this Court's policy is to protect the privacy of the child by using only the first name and last initial of the parties involved. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

(collectively "Petitioners") in September 2017. This appeal involves a petition to terminate Mother's parental rights to the children.

When Mother and Father divorced in 2014, Mother agreed that Father should be designated as the primary residential parent of the children. At the time, Mother was addicted to illicit drugs and admitted that she could not provide adequate care for the children. Since Mother and Father separated, the children have lived exclusively with Father in Tennessee. Under the permanent parenting plan that was entered upon their divorce, Mother was granted visitation with the children every other weekend. However, Mother has not seen the children since 2015.

After Mother and Father's divorce, Mother began incurring numerous criminal charges in Kentucky, where she resided. In January 2017, Mother pled guilty to numerous drug-related charges that she committed in 2015. As a result of her guilty plea, Mother was sentenced to 12 months of incarceration and 24 months of probation. Mother also pled guilty to multiple DUI charges after driving under the influence in 2014 and 2016. Due to her criminal charges and convictions, Mother was incarcerated from November 24, 2016 to January 20, 2017 and again from March 20, 2017 to January 19, 2018. Prior to trial in this case, the last time she saw the children was in the fall of 2015.

On October 20, 2017, while Mother was incarcerated, Petitioners filed a petition to terminate Mother's parental rights and for Stepmother to adopt the children. As grounds for termination, Petitioners alleged that Mother abandoned the children by failing to visit and by failing to provide support during the four months that preceded the filing of the petition.

On February 19, 2018, Mother answered the petition. In her answer, Mother argued that Petitioners failed to comply with the requirements of Tennessee Code Annotated section 36-1-113. Specifically, Mother asserted that she was incarcerated at the time the petition was filed and that the petition failed to state grounds for termination of the rights of an incarcerated parent. Based on the deficiency in the petition, Mother moved to dismiss the petition. Shortly after Mother filed her initial answer, in May 2018, she moved to enforce the visitation schedule contained in the parties' permanent parenting plan. This was the first time since the parties' divorce in 2014 that Mother attempted to formally enforce the visitation schedule.

After a hearing on Mother's motion to dismiss, the trial court agreed that Petitioners failed to adequately plead a ground for termination. However, the court allowed Petitioners to amend the petition to include the requisite four-month period and instructed Mother to provide Petitioners her dates of incarceration prior to the filing of the petition.

On February 22, 2019, Petitioners filed an amended petition. In the amended petition, Petitioners again alleged that Mother abandoned the children by failing to support

and by failing to visit. Petitioners stated that Mother's relevant periods of incarceration were from November 24, 2016 to January 20, 2017, and again from March 20, 2017 to January 19, 2018. Accordingly, Petitioners argued that, excluding those periods of incarceration, Mother abandoned the children during an aggregated four months prior to Petitioners filing the original petition.

In an amended answer, Mother admitted to the alleged periods of incarceration. Mother also claimed that Petitioners thwarted her attempts to visit and provide support during the requisite four-month period.

On July 28, 2020, the trial court conducted a final hearing on the petition. Several witnesses testified at the hearing, including Father, Stepmother, Anna, and Mother. At the outset of the hearing, the parties agreed to an aggregate four-month period under Tennessee Code Annotated section 36-1-102(1)(A)(iv). The parties agreed that, excluding Mother's periods of incarceration, the relevant four-month period of non-incarceration was from September 24 to November 24, 2016 and January 20 to March 20, 2017.

Father testified that he and the children reside with Stepmother and her biological son. Father stated that the children are established in the home and are doing exceptionally well. He testified that Anna is involved in various activities, such as soccer and cheerleading, and is receiving high grades in school. When asked about Anna's relationship with Stepmother, Father stated that, at times, they bicker like a normal daughter and mother, but they have a positive relationship overall. Similarly, Father stated that Mason plays several sports and gets along well with Stepmother. In contrast to the children's relationship with Stepmother, Father testified that Mother did not visit or attempt to contact the children during the relevant four-month period. He further stated that between the parties' divorce in 2014 and the filing of the petition in 2017, Mother attempted to contact the children approximately five times. Until the petition was filed, Father did not receive any letters, cards, or gifts from Mother to the children. However, Father stated that after Mother was released from incarceration in January 2018, he began receiving cards from Mother addressed to the children. According to Father, Mason, who was two years old when he last saw Mother, had no relationship with Mother.

Stepmother also testified to her relationship with the children. Stepmother had experienced previous legal issues similar to that of Mother in her past. Prior to marrying Father, Stepmother had been incarcerated for various drug-related charges. Although she used drugs in the past, Stepmother testified that she has not used drugs since she was released from incarceration in December 2014. Stepmother verified that she and her biological son have lived with Father and the children since 2016. She testified that she raises Anna and Mason as if they are her biological children and that they refer to her as "Mom." Stepmother stated that she helps perform parenting responsibilities such as transporting the children to their activities, cooking for the family, and putting the children to bed at night. Similar to Father's testimony, Stepmother also stated that the family did

not receive any mail from Mother until after the petition was filed.

Anna, who was fourteen years old at the time of trial, also testified. Anna confirmed that she refers to Stepmother as "Mom" because she views her as her mother. She also referred to Stepmother's biological son as her "brother." Anna stated that she understood that the trial court was being asked to terminate Mother's parental rights and that she wanted Stepmother to be her legal mother.

In regards to her relationship with Mother, Anna testified that, even if Mother is no longer using drugs, she does not want to have contact with her. When asked about Mother's recent efforts to make contact, Anna stated that she remembered receiving cards and letters on holidays. However, she received the majority of these correspondences after the termination petition was filed. Anna was aware that there were instances when Mother attempted to contact her through Father but said that she would inform Father that she did not want to speak with Mother. Anna's previous interactions with Mother were tumultuous and sporadic. In particular, Anna described instances where she would find needles in Mother's purse or under her bed. She also stated that Mother was "in and out of our lives." Anna estimated that she last saw Mother approximately six years prior to trial when she and Mason were visiting their maternal grandmother. Anna testified that during the visit, Mother arrived and began fighting with the grandmother, which resulted in law enforcement being called to the scene. Anna also stated that because Mason was "really young" when he last saw Mother, he does not have a relationship with Mother.

Mother testified on her criminal history, her efforts to change her lifestyle, and her recent efforts to contact the children. Mother admitted to her prior drug use that resulted in multiple periods of incarceration. Initially, Mother claimed that she began using drugs "around 2015." However, she later admitted meeting Stepmother when she was using drugs, which was prior to her divorce from Father in 2014. Despite her prior drug use, Mother asserted that she has been "clean" since she was incarcerated in March 2017. Mother testified that since she was last released from incarceration, she has obtained employment, had earned an Associate's degree in science, and had made plans to complete a physical therapy assistant program. During her prior incarcerations, Mother entered rehabilitation programs, but she did not complete any of those programs.

Mother admitted that she has no affirmative proof of her efforts to contact the children prior to the petition being filed. She claimed that she made efforts that went unanswered. However, her testimony on her pre-petition efforts was inconsistent. Initially, Mother stated that during one period of incarceration, she sent the children a letter and a drawing. When asked about another period of incarceration, she stated that she did not send anything to the children because she did not know what to say. During a stint in a rehabilitation program in 2017, Mother claimed that she was not allowed to make phone calls or write letters. Additionally, when she was asked why she did not attempt to enforce her visitation rights prior to the petition being filed, Mother stated that she "felt like [she]

- 4 -

couldn't fight" as a drug addict.

Mother testified that since the petition was filed in October 2017, she has made numerous efforts to contact the children. Mother claimed that she mailed the children cards on birthdays and holidays. She also asserted that she made numerous calls and sent text messages to Father in an attempt to contact the children. Mother explained that she did not have a phone when she first left incarceration, so she often used the maternal grandmother's cell phone to call Father. She claimed that even when she eventually obtained her own phone, she continued to use the grandmother's phone to contact Father. At trial, Mother produced copies of the text messages that she claimed she sent to Father. Certain messages indicated that they were sent by Mother, but others did not include a reference to Mother. In fact, multiple messages included plural nouns such as "we" or "us." Mother explained that she sent the messages from the maternal grandmother's phone and that the plural wording referred to her, the grandmother, and the maternal grandfather. Regardless, Father did not answer any of the purported efforts that Mother made after the petition was filed. When asked whether she left voice messages when Father did not answer, Mother stated that she "don't like to" leave messages and that she would "rather just call and hope that he answers."

Similar to Father not responding to Mother's alleged calls and text messages after Petitioners filed their petition, Mother claimed that Father did not inform her of the children's activities prior to the petition being filed. In particular, Mother asserted that Father did not provide Mother with information on the children's sporting events, their medical appointments, or their education. However, Mother also admitted that she did not make efforts to contact the children's school or their doctor's office. Instead, she again claimed that she was unable to initiate the contact when she was addicted to drugs. Mother also claimed that Petitioners thwarted her attempts to contact the children by blocking her on social media. Based on her absence from the children's lives, Mother admitted that reintroducing the children to her would be difficult. However, she stated that the bonds could be mended.

On August 10, 2020, the trial court entered a written order on the petition to terminate Mother's parental rights. In its order, the trial court found that Petitioners sufficiently established abandonment for failure to visit as a ground to terminate Mother's parental rights. The court agreed with the parties that the relevant aggregate four-month period under this ground was from September 24 to November 24, 2016, and January 20 to March 20, 2017. The court noted that prior to trial, Mother had not seen the children since the fall of 2015, well beyond the four-month period. The court found that Mother's attempts to contact the children, including her purported calls, text messages, and letters, did *not* occur during the relevant four-month time period. Although Petitioners also alleged that Mother failed to support the children during the statutory four-month period as a

ground for termination, the court concluded that Petitioners failed to establish this ground.[2]

Further, the trial court specifically found that Mother's testimony was not credible on several issues. Specifically, the court concluded that Petitioners did not block or interfere with Mother having contact with the children. When discussing Mothers efforts to send text messages and phone calls, the court took issue with Mother's testimony. In particular, the court stated that Mother had her own phone at the time several of the messages were sent and that at least one message was sent by the maternal grandmother, despite Mother claiming that she sent the message.[3] The court also noted that Mother admitted that she did not typically leave voice messages when she would attempt to call Father. Meaning, that if Mother was actually calling from the grandmother's phone, Father would have no way of knowing that it was actually Mother calling.

Having found that abandonment by failure to visit was established as a ground for termination, the trial court also found that it was in the best interest of the children to terminate Mother's parental rights. Accordingly, the trial court terminated Mother's parental rights to the children.

Mother timely appealed.

## II. ISSUES PRESENTED

On appeal, Mother presents four issues for review, which we have reworded:

1. Whether Petitioners established the requisite four-month period of Mother's non-incarceration under Tennessee Code Annotated section 36-1-102(1)(A)(iv);

2. Whether Petitioners thwarted Mother's efforts to visit or contact the children;

3. Whether it is in the best interest of the children to terminate Mother's parental rights; and

4. Whether there was a "less restrictive alternative" to terminating Mother's parental rights.

For the reasons stated herein, we affirm the trial court's decision to terminate

---

[2] Under the permanent parenting plan that was entered upon Mother and Father's divorce, the parties agreed to waive Father's child support obligation. The trial court determined that this relieved Mother of her obligation to provide child support. On appeal, Petitioners do not challenge the trial court's finding on this ground.

[3] The maternal grandmother also testified at the final hearing. When asked about the text messages that Mother claimed to have sent from her phone, the grandmother testified that she sent one of the messages.

Mother's parental rights and remand.

### III.  STANDARDS IN TERMINATION CASES

The Due Process Clauses in the federal and state constitutions recognize a parent's fundamental right to the care and custody of his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). It is one of the oldest judicially recognized liberty interests. *In re Carrington H.*, 483 S.W.3d at 521. Although it is a fundamental right, it is not absolute. *Id.* at 522; *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005).

A party seeking to terminate the parental rights of another must prove two elements. First, the petitioner must prove one of the statutory grounds for termination listed under Tennessee Code Annotated section 36-1-113(g). *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). Second, the petitioner must prove that terminating the parent's rights is in the best interest of the child. *Id.* "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d at 860. Therefore, certain protections are afforded to the parent, including the petitioner being required to prove these elements by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 522; *In re Kaliyah S.*, 455 S.W.3d at 552. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It must "eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

"Rule 13(d) of the Tennessee Rules of Appellate Procedure supplies the standard that governs an appellate court's review of a trial court's determination in a parental termination proceeding." *In re Neveah M.*, 614 S.W.3d 659, 673 (Tenn. 2020) (citing *In re Carrington H.*, 483 S.W.3d at 523-24). Pursuant to Rule 13(d), we review the trial court's factual findings *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. *Id.* at 674 (citing *In re Carrington H.*, 483 S.W.3d at 524). Conclusions of law are also reviewed *de novo* but with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524.

### IV.  DISCUSSION

#### A.  Abandonment – Failure to Visit

In its order of termination, the trial court found that Mother abandoned the children under Tennessee Code Annotated sections 36-1-102(1)(A)(iv) and -113(g)(1). Mother argues that Petitioners erred by including her time in rehabilitation when calculating the four-month period under this ground. Mother also argues that Petitioners thwarted

Mother's efforts to visit the children. Specifically, Mother claims that because her efforts were thwarted by Petitioners, any failure to visit was not willful.

As stated in Tennessee Code Annotated section 36-1-113(g)(1), "abandonment" can serve as a potential ground to terminate a parent's parental rights. Section 36-1-102(1) provides several definitions for abandonment. Subsection (1)(A)(iv) provides several "mechanisms by which abandonment may be proven when the parent is incarcerated at or shortly before the filing of the termination petition." *In re Navada N.*, 498 S.W.3d 579, 597 (Tenn. Ct. App. 2016). As relevant to this appeal, this definition of "abandonment" was present when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has willfully failed to visit . . . for four (4) consecutive months immediately preceding such parent's or guardian's incarceration.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2017).[4] It is undisputed that Mother was incarcerated at the time Petitioners filed their petition to terminate Mother's parental rights. Therefore, section 36-1-102(1)(A)(iv) applies for determining whether "abandonment" is present in this case.

For determining the applicable four-month period of abandonment, Tennessee Code Annotated section 36-1-102(1)(A)(iv) further states:

> If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of non[-]incarceration beginning with the most recent period of non[-]incarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of non[-]incarceration.

In this case, Mother was incarcerated from November 24, 2016 to January 20, 2017 and again from March 20, 2017 to January 19, 2018. The Petitioners' termination petition

---

[4] The relevant portions of the Code that are cited herein are cited according to how they appeared when Petitioners initiated this case in October 2017. "Willfulness" is no longer a requirement of section 36-1-102(1); instead, "[e]ffective July 1, 2018, our General Assembly amended [section] 36-1-102(1) to make the absence of willfulness an affirmative defense." *In re Arianna B.*, 618 S.W.3d 47, 62 (Tenn. Ct. App. 2020).

was filed on October 20, 2017. Accordingly, Petitioners and Mother stipulated that the aggregate four-month period under section 36-1-102(1)(A)(iv) was from September 24 to November 24, 2016, and from January 20 to March 20, 2017. The trial court relied on this stipulated time period in reaching its conclusion that Mother abandoned the children for failing to visit.[5]

On appeal, Mother asserts that she was in a rehabilitation facility during a portion of the stipulated four-month period. Mother claimed that she was unable to contact the children while she was in the rehabilitation facility. Therefore, she argues that the period of time that she spent at the rehab facility "should not have been counted" in the four-month period for determining abandonment under section 36-1-102(1)(A)(iv). Mother gives no citation to support this assertion. The statute requires aggregation of periods of "nonincarceration." In addition, the trial court did not find Mother's testimony to be credible, and aside from her testimony, there was no proof that Mother was in a rehabilitation facility during the stipulated four-month period. The trial court also stated that there was no indication that Mother was prevented from contacting the children at any point during the stipulated four-month period. This finding is presumed correct. *See* Tenn. Rule App. P. 13(d); *In re Neveah M.*, 614 S.W.3d at 674.

From our review, we agree with the trial court that there is no proof to indicate that Mother was restricted from contacting the children during the stipulated four-month period. Great weight is afforded to the trial court's determination that Mother was not credible. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). Accordingly, we conclude that Mother was not restricted from contacting the children at any point during the stipulated four-month period.

The last time Mother saw either of the children was in the fall of 2015. Clearly, Mother's most recent visit with the children was well beyond the stipulated four-month period. Mother testified at length on the phone calls, text messages, and cards that she sent to the children. However, all of the efforts that Mother testified to were made *after* the termination petition was filed rather than during the pre-filing four-month period. Anna testified that she received letters from Mother shortly after her parents divorced in June 2014, but that she stopped receiving them after she returned them. Regardless, any letters that Anna may have received directly after the divorce would have occurred outside of the relevant four-month period. Therefore, evidence presented shows that Mother's efforts to visit or contact the children took place beyond the four-month period of abandonment.

Mother also argues that her lack of visitation was not willful because Petitioners thwarted her efforts to contact the children. A parent willfully fails to visit a child when the parent "is aware of his or her duty to visit or support, has the capacity to do so, makes

---

[5] Mother does not argue that a four-month period prior to the date of the amended petition, February 22, 2019, should apply.

no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. A parent's failure to visit "is not excused by another person's conduct unless the conduct actually prevents the [parent] from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* (citations omitted). Stated differently, a "parent who attempts to visit and maintains a relationship with the child, but is 'thwarted by the acts of others and circumstances beyond [her] control,' cannot be found to have willfully abandoned the child." *In re Jaylah W.*, 486 S.W.3d 537, 551 (Tenn. Ct. App. 2015) (alteration in original) (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

Although Mother claims that Petitioners thwarted her efforts to contact the children, again, the trial court found that Mother was not credible on this issue. Instead, the court found that at no point did Petitioners thwart Mother's supposed efforts to contact the children. We place great emphasis on the trial court's credibility determination, *see In re Adoption of A.M.H.*, 215 S.W.3d at 809, and the evidence does not preponderate against the court's finding on this issue.[6] Therefore, this finding is presumed correct. *See* Tenn. Rule App. P. 13(d); *In re Neveah M.*, 614 S.W.3d at 674. Further, Mother was entitled to visitation with the children every other weekend under the permanent parenting plan that was entered upon the parties' divorce. Despite being entitled to visitation, Mother did not seek to enforce her visitation until right *after* the termination petition was filed, beyond the four-month period under section 36-1-102(1)(A)(iv). *See also* Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child."). Mother's explanation that she did not enforce her rights because she "felt like [she] couldn't fight" as a drug addict is not a justifiable excuse for failing to visit. Mother was aware of her obligation to visit the children and was capable of visiting, but she simply decided not to seek visitation until after the termination petition was filed.

Based on our foregoing discussion, we affirm the trial court's conclusion that Mother abandoned the children under Tennessee Code Annotated sections 36-1-102(1)(A)(iv) and -113(g)(1) by willfully failing to visit the children from September 24 to November 24, 2016, and from January 20 to March 20, 2017.[7]

---

[6] Although the maternal grandmother's testimony verified some of Mother's statements, the trial court clearly relied primarily on Petitioners' testimony. We do not find a sufficient basis to disturb the trial court's reliance.

[7] Again, the parties stipulated that the aggregate four-month period of non-incarceration spanned from September 24 to November 24, 2016, and from January 20 to March 20, 2017. However, "the four-month period 'immediately preceding' [a] parent's incarceration ends on the day before the actual date of incarceration." *In re Braxton M.*, 531 S.W.3d 708, 720 (Tenn. Ct. App. 2017). Meaning, because Mother left incarceration on January 20, 2017, and reentered incarceration on March 20, 2017, these days should not have been counted in the aggregated four-month period. Although the parties and the trial court made a slight miscalculation of the four-month period, because the trial court's final order includes sufficient

- 10 -

## B. Best Interests

Because we have concluded that Petitioners have established at least one ground to terminate Mother's parental rights, we must now determine whether termination is in the best interest of the children. *See In re Neveah M.*, 614 S.W.3d at 678. In making this best interest determination, we are instructed to consider the factors listed in Tennessee Code Annotated section 36-1-113(i).[8] *In re Carrington H.*, 483 S.W.3d at 523. The relevancy and weight that a court places on each factor depends on the unique facts of each case. *In*

---

findings of fact on the correct four-month period, in this instance, the miscalculation is harmless. *See, e.g.*, *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020) (stating that "any error from the [trial court's] use of the incorrect four-month period is harmless"); *In re Braxton*, 531 S.W.3d at 720 (stating that a one-day difference in the calculated four-month period "[did] not affect the outcome of [the] action").

[8] The factors listed in Tennessee Code Annotated section 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

*re Neveah M.*, 614 S.W.3d at 679. Each factor must be considered, but courts are not required "to find the existence of each factor before it concludes that terminating a parent's rights is in the child's best interest." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)). If the best interests of the child and the parent conflict, courts must resolve the conflict in favor of the child. *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36-1-101(d); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

Under factor (1), Mother argues that she has made a meaningful adjustment to her lifestyle as to make it safe for her to visit the children. She claims that she has not used drugs since March 2017—when she last entered incarceration—and that she has become a productive citizen by furthering her education, obtaining employment, and forgoing her criminal lifestyle. While Mother emphasizes that it is now safe for her to visit the children, the language of factor (1) focuses on whether the children would be safe in the parent's home. *See* Tenn. Code Ann. § 36-1-113(i)(1). Although Mother has not incurred new drug charges since she was last incarcerated, she admitted that her previous attempts to attend a rehabilitation facility were not successful. Further, aside from her testimony, which the trial court found was not credible, there is no evidence that she has actually submitted and passed random drug screens since leaving incarceration. As a whole, we cannot say that Mother has made a sufficient adjustment to her conduct or conditions that would allow the children to safely be in Mother's home.

There was no proof that a social services agency provided assistance to Mother. Therefore, factor (2) is not applicable.

Under factor (3), as we have discussed at length, Mother has failed to maintain regular contact or visitation with the children. We find it particularly striking that Mother did not attempt to enforce her visitation rights until *after* Petitioners filed the termination petition. Prior to the petition being filed, Mother made only token efforts to contact the children and committed several criminal acts. Factor (3) weighs in favor of termination.

It is clear that neither of the children have a meaningful relationship with Mother. Mother has not seen the children since the fall of 2015. Anna testified that because Mason was very young when he last saw Mother, she does not believe that he has a relationship with Mother. Although Anna does remember Mother, she testified that she does not want to have contact with her and, instead, wants to be adopted by Stepmother. Mother admitted that reintroducing her to Mason would "be rough" on Mason since they had not seen each other in several years. In addition to Mother failing to contact or visit the children, she did not attend the children's activities and did not inquire about their medical care or educational progress. In contrast to the nonexistent relationship between Mother and the children, Father and Stepmother appear to be well-bonded with the children. Petitioners provide a safe and nurturing home for the children. The children participate in sports and

other activities, have performed well in school, and refer to Stepmother as "Mom." Disturbing the positive environment that has been provided for the children would not be in their best interests. Taken together, factors (4) and (5) weigh in favor of termination.

Anna testified that when she was last in Mother's care, she found drug paraphernalia in Mother's purse and under her bed. Additionally, in 2017, Mother pled guilty to purchasing drugs in the presence of a minor. Although the identity of the minor is unclear based upon the record, based on the neglect that Mother exhibited towards Anna when she was in her care, factor (6) weighs in favor of termination.

Although the maternal grandmother testified that Mother has lived in her home for several years, there is not sufficient evidence to make a finding on factor (7). Similarly, there was no proof presented regarding Mother's mental or emotional state under factor (8).

Regarding support, Mother testified that she began collecting items for the children after she was released from incarceration. However, she has not provided those items to the children. Further, Mother did not provide support of any kind prior to the termination petition being filed. The absence of a child support order that required Mother to provide support is not a justifiable excuse for her lack of support. *See In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013) (stating that every adult parent "is presumed to know that she has a duty to provide financial support for her child"). Factor (9) also weighs in favor of termination.

After considering the factors listed in Tennessee Code Annotated section 36-1-113(i), we find that there is clear and convincing evidence to show that it is in the best interest of the children to terminate Mother's parental rights.

## C. *"Less Restrictive Alternative"*

Mother also claims that the trial court should have considered a "less restrictive alternative" to terminating her parental rights. In support of this argument, Mother cites Tennessee Code Annotated section 36-6-301, a *visitation* statute addressing custodial and noncustodial parents. This section is not at issue in this case, and its application is not a part of a court's analysis when the court is presented with a petition to terminate a parent's parental rights. Mother's suggestion that there is a "less restrictive alternative" to terminating her rights shows a misunderstanding of the applicable law. In termination cases, it is not the court's role to find an alternative to termination or to find an outcome that may appease both parties. The court's role is to (1) determine whether the petitioner has properly established a ground for termination and (2) determine whether termination is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d at 552. If these elements are satisfied, then the court may terminate the parent's rights. Section 36-1-113 does not include a "less restrictive alternative" avenue to

termination.

Because this issue is not applicable in this case, whether there was a "less restrictive alternative" to the termination of Mother's parental rights shall not be discussed further herein.

### V.     CONCLUSION

We affirm the finding that there is clear and convincing evidence to support the ground of abandonment by an incarcerated parent for Mother's failure to visit the children. We also affirm the trial court's conclusion that it is in the best interest of the children to terminate Mother's parental rights. Therefore, for the reasons stated herein, we affirm the trial court order terminating Mother's parental rights to Anna and Mason.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against appellant, Meagan H., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE